19-995

*In Re: Bernard L. Madoff Investment Securities LLC (Marshall v. Capital Growth Co.)*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

### <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of June, two thousand twenty.

**PRESENT:**
        **PIERRE N. LEVAL,**
        **PETER W. HALL,**
        **GERARD E. LYNCH,**
           *Circuit Judges.*

———————————————————

IN RE: BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

        *Debtor,*                           19-995-bk

———————————————————

SUSANNE STONE MARSHALL, ADELE FOX,
MARSHA PESHKIN, RUSSELL OASIS,

*Appellants,*

v.

CAPITAL GROWTH COMPANY, DECISIONS INCORPORATED, FAVORITE FUNDS, JA PRIMARY LIMITED PARTNERSHIP, JA SPECIAL LIMITED PARTNERSHIP, JAB PARTNERSHIP, JEMW PARTNERSHIP, JF PARTNERSHIP, JFM INVESTMENT COMPANIES, JLN PARTNERSHIP, JMP LIMITED PARTNERSHIP, JEFFRY M. PICOWER SPECIAL COMPANY, JEFFRY M. PICOWER, P.C., THE PICOWER FOUNDATION, THE PICOWER INSTITUTE OF MEDICAL RESEARCH, THE TRUST F/B/O GABRIELLE H. PICOWER, BARBARA PICOWER, individually, and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust f/b/o Gabrielle H. Picower, IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,

*Appellees,*

_____

| | |
|---|---|
| For Appellants: | LANCE GOTTHOFFER, (Helen Davis Chaitman, *on the brief*), Chaitman LLP, New York, New York. |
| For Appellees the "Picower Parties"*: | GARY STEIN (William D. Zabel, Jennifer M. Opheim, Randall T. Adams, Abigail F. Coster, *on the* |

---

* The "Picower Parties" refers to Appellees Capital Growth Company, Decisions Incorporated, Favorite Funds, JA Primary Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JFM Investment Companies, JLN Partnership, JMP Limited Partnership, Jeffry M. Picower, P.C., The Picower Foundation, The Picower Institute of Medical Research, The Trust f/b/o Gabrielle H. Picower, Barbara Picower, individually, and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust f/b/o Gabrielle H. Picower.

*brief*), Schulte Roth & Zabel LLP, New York, NY.

For Appellee Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC: AMY E. VANDERWAL (David J. Sheehan, Keith R. Murphy, Ferve Khan, *on the brief*), Baker & Hostetler LLP, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Broderick, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court is **AFFIRMED**.

## I. BACKGROUND

Appellants Susanne Stone Marshall, Adele Fox, Marsha Peshkin, and Russell Oasis [1] (the "Fox Plaintiffs")—former clients of Bernard L. Madoff Investment Securities LLC ("BLMIS")—filed a complaint in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking a declaration that their Third Amended Complaint ("TAC") asserted claims that were not barred by an automatic stay and permanent injunction

---

[1] Individually and on behalf of similarly situated parties.

resulting from a global settlement (the "Settlement") approved by the Bankruptcy Court. The Fox Plaintiffs' TAC—which they seek to file in the United States District Court for the Southern District of Florida—asserts claims against a number of parties affiliated with Jeffrey M. Picower[2] (collectively, the "Picower Parties"), a former business associate of Bernard L. Madoff ("Madoff").

In 2008, after Madoff's Ponzi scheme came to light and he was arrested, BLMIS entered into liquidation proceedings pursuant to the Securities Investor Protection Act ("SIPA"). 15 U.S.C. § 78aaa *et seq.* The liquidation trustee for the BLMIS estate, Irving H. Picard (the "Trustee"), initiated adversary proceedings against the Picower Parties to recover fraudulent transfers made by BLMIS to the Picower Parties during the operation of Madoff's Ponzi scheme. In 2011, the Trustee, the Picower Parties, and the government entered into the Settlement, under which the Picower Parties agreed to pay $5 billion to the Trustee and forfeit $2.2 billion to the government.

In their TAC, the Fox Plaintiffs assert a control person claim pursuant to § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), alleging that Picower controlled Madoff and BLMIS in the creation and perpetuation of the Ponzi

---

[2] Picower died in October 2009.

4

scheme. The dispositive issues on appeal are whether the Fox Plaintiffs have adequately alleged a control person claim and whether that claim is derivative of claims that were or could have been brought by the Trustee during the SIPA liquidation proceedings.

**A. Madoff's Ponzi Scheme**

Madoff's Ponzi scheme is detailed in numerous decisions of the Bankruptcy Court, the district courts, and this Court. *E.g., Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411, 414–15 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015). To summarize:

> Madoff claimed he was investing BLMIS's customers' funds in stocks and then hedging with option trades. In reality, Madoff never invested any of the funds. Instead, BLMIS generated fictitious account statements reflecting trades that were never actually completed and profits that were never actually generated. Because BLMIS was not actually generating profit, it paid customers who withdrew funds with the proceeds of other customers' investments. Eventually, BLMIS was unable to meet its customers' demands for withdrawals, and the scheme collapsed.

*A & G Goldman P'ship v. Picard (In re BLMIS)* ("*Goldman III*"), 739 F. App'x 679, 681 (2d Cir. 2018) (summary order) (internal citations omitted).

**B. The Settlement with the Picower Parties**

In May 2009, the Trustee initiated adversary proceedings in the SIPA liquidation against Jeffry Picower and the Picower Parties to recover money that BLMIS had fraudulently transferred to the Picower Parties between 1995 and 2008. In those actions, the Trustee alleged that the Picower Parties benefited from the Ponzi scheme and either knew or should have known that BLMIS was a Ponzi scheme; the Trustee also alleged that the Picower Parties directed BLMIS employees to create fictitious trading records for their accounts, enabling them to withdraw billions of dollars from BLMIS before the scheme collapsed.[3] In January 2011, the Bankruptcy Court approved the Settlement, whereby the Picower Parties agreed to pay $5 billion to the Trustee and forfeit $2.2 billion to the government. Pursuant to Section 105(a) of the Bankruptcy Code, the Bankruptcy Court issued a permanent injunction when it approved the Settlement.[4] The relevant portion of the injunction states:

> [A]ny BLMIS customer or creditor of the BLMIS estate . . . is hereby permanently enjoined from asserting any claim against the Picower [Parties] that is duplicative or derivative of the claims brought by the

---

[3] The Government separately pursued a civil forfeiture action against the Picower Parties. *See* 18 U.S.C. § 981(a)(1)(C).

[4] The permanent injunction was in addition to the automatic stay that already existed during the course of the liquidation proceedings. *See* 11 U.S.C. § 362.

Trustee, or which could have been brought by the Trustee against the Picower [Parties] . . . .

App'x 499.

Two of the Fox Plaintiffs—Adele Fox and Susanne Marshall—objected to the Settlement and permanent injunction, but their challenges were overruled by the Bankruptcy Court. The District Court affirmed the Bankruptcy Court's ruling, as did we. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010), *aff'd Fox v. Picard*, (*In re Madoff*), 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd Fox v. Picard*, (*In re BLMIS*) ("*Fox I*"), 740 F.3d 81 (2d Cir. 2014).

## C. Prior Attempts to Sue the Picower Parties

Prior to and since the issuance of the permanent injunction, two groups of putative class-action plaintiffs—the Fox Plaintiffs and another group of former Madoff clients, the "Goldman Plaintiffs"—have repeatedly attempted to assert claims, independent of the bankruptcy proceedings, against the Picower Parties to recover lost investments. A total of twelve decisions has been issued rejecting those claims.[5] In several of these prior actions, the Fox and Goldman Plaintiffs

---

[5] *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010), *aff'd Fox v. Picard (In re Bernard L. Madoff)*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd Fox v. Picard, (In re BLMIS)*, 740 F.3d 81 (2d Cir. 2014); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 477 B.R. 351 (Bankr. S.D.N.Y. 2012), *aff'd In re Bernard L. Madoff Inv. Sec., LLC*, No. 12 CIV. 6109 RJS, 2013 WL 5511027 (S.D.N.Y.

have attempted to circumvent the permanent injunction through claims against the Picower Parties, asserting that Picower is liable as a "control person" under § 20(a) of the Securities Exchange Act. Every court that has considered these claims has ruled that the complaints against the Picower Parties were barred by the permanent injunction.[6]

**D. The Third Amended Complaint**

The Fox Plaintiffs' TAC, which they attached to their complaint for declaratory judgment,[7] seeks compensatory and punitive damages from the Picower Parties. The TAC asserts six claims against the Picower Parties, including a claim for control person liability under § 20(a) of the Securities

---

Sept. 30, 2013); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 511 B.R. 375 (Bankr. S.D.N.Y. 2014), *aff'd In re Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 345 (S.D.N.Y. 2015); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016), *aff'd In re Bernard L. Madoff Inv. Sec. LLC*, 565 B.R. 510 (S.D.N.Y. 2017), *aff'd*, 739 F. App'x 679 (2d Cir. 2018); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 203 (Bankr. S.D.N.Y. 2017), *aff'd*, 598 B.R. 102 (S.D.N.Y. 2019) (decision below).

[6] *See* 477 B.R. 351 (Bankr. S.D.N.Y. 2012), *aff'd* No. 12 CIV. 6109 RJS, 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013); *and* 511 B.R. 375 (Bankr. S.D.N.Y. 2014), *aff'd* 531 B.R. 345 (S.D.N.Y. 2015); *and* 546 B.R. 289 (Bankr. S.D.N.Y. 2016), *aff'd* 565 B.R. 510 (S.D.N.Y. 2017), *aff'd*, 739 F. App'x 679 (2d Cir. 2018); *and* 568 B.R. 203 (Bankr. S.D.N.Y. 2017), *aff'd*, 598 B.R. 102 (S.D.N.Y. 2019).

[7] The Fox Plaintiffs' complaint for a declaratory judgment, filed pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, seeks a declaration that neither the permanent injunction nor the automatic stay provisions of 11 U.S.C. § 362 prohibit them from filing and prosecuting their proposed TAC.

Exchange Act, as well as claims for violations of both federal and Florida RICO statutes, and Florida common law. On appeal, the Fox Plaintiffs have confined their arguments to whether their control person claim is properly pleaded and whether that claim alleges a particularized injury so that the claim is not barred by the permanent injunction. We, therefore, limit our analysis to resolving those issues. *See, e.g.*, *United States v. Joyner*, 313 F.3d 40, 44 (2d Cir. 2002) ("It is well established that an argument not raised on appeal is deemed abandoned . . . ." (internal quotation marks omitted)).

### 1. New Allegations

Before the district court, the Fox Plaintiffs argued that the TAC differs from their prior complaints because it makes two new allegations relevant to the control person claim: first, that Picower made loans to BLMIS to support the Ponzi scheme; and second, that Picower agreed to be listed as a counterparty in various fictitious options trades. These allegations have already been considered and found insufficient in *Goldman III* and the Fox Plaintiffs do not rely on them on appeal. *See id.*, 739 F. App'x at 685–86. We therefore deem them abandoned. *See Joyner*, 313 F.3d at 44. Instead, they advance arguments grounded in two new sources of evidence.

### 2. New Sources of Evidence

#### (a) The Madoff Deposition

The Fox Plaintiffs rely on two new sources of information that pertain to Picower's alleged control of BLMIS; they assert these new sources distinguish their TAC from the complaint in *Goldman III*. First, the TAC references a deposition of Madoff taken in 2012 during an unrelated case, *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244 (S.D.N.Y. 2011) (the "Madoff Deposition"), which the Fox Plaintiffs attached to their TAC. In the Madoff Deposition, Madoff generally describes the origins and operation of his fraud.

There are also sections of the deposition in which Madoff discusses Picower's relationship with the Ponzi scheme. Madoff describes how it was "primarily Picower" and another client who pressured Madoff into assuming a risky investment position that would later lead to Madoff becoming billions of dollars in debt which in turn spurred the creation of the Ponzi scheme. App'x 96. Madoff also relates that he was personally very close to Picower—Madoff was the executor of Picower's estate—and he alludes to the fact that he had information implicating Picower in some sort of illegal activity. Aside from asserting that tax

laws were broken, however, Madoff did not elaborate on any other information he may have about any alleged illegality committed by Picower.

In the deposition, Madoff also takes responsibility for the creation of the Ponzi scheme. He describes his decisions in the first person. *See* App'x 97 ("So I foolishly decided that I would step in, and I would take their position on the short side of the option . . . ."); *id.* at 98 ("I decided to take this [hedge fund] money in."); *id.* at 100 ("So I made my second blunder, and I said, okay. Look, I'll shorten the position goal . . . ."); *id.* ("I wasn't executing the transaction correctly. So the transaction is now a bogus transaction."). More directly, when asked why he created his giant Ponzi scheme, Madoff responded:

> Well, because I allowed myself foolishly, as I said, to be trapped into something. And what I looked at as being a temporary situation, that was going to work out well for everyone, my clients, as well as myself, I, you know, decided to take the risk and convinced myself that it was going to work out.
>
> I then, after awhile, became aware of the fact that I was not going to be able to extricate myself from this mess, and then didn't have the courage or the character, you know, to—to fess up to it.

App'x 111.

**(b) The Madoff Declaration**

The second new source of information that the Fox Plaintiffs rely on as a basis for their control person claim is a declaration by Madoff (the "Madoff Declaration") made on November 17, 2015, in connection with another unrelated case. In it, Madoff asserts that "[p]ost 1990, I was put under enormous financial pressure by Jeffry Picower, who created the fraud I perpetrated and who was, by far, the primary beneficiary of the fraud. In order to raise money, I began to defraud my customers but I never sent checks to customers who did not request withdrawals in writing." App'x 1484. Madoff went on to state, "the government and the Trustee have placed great reliance on the testimony of Frank DiPascali who, after Picower and me, bore the most responsibility for the fraud we perpetrated." *Id*.

**E. Procedural History**

On March 7, 2017, the Bankruptcy Court (Bernstein, *B.J.*) dismissed the Fox Plaintiffs' complaint for a declaratory judgment, concluding that their TAC violated the permanent injunction because it contained only derivative claims.[8]

---

[8] Although the Fox Plaintiffs also challenged the automatic stay in place pursuant to 11 U.S.C. § 362, the Bankruptcy Court did not reach that issue because it found that the permanent injunction independently barred the Fox Plaintiffs' claims. *See Fox v. Capital Growth Co.*, 568 B.R. at 217 n.16 (Bankr. S.D.N.Y. 2017).

*See* 568 B.R. at 217 (holding that the Fox Plaintiffs "failed to identify a particularized injury suffered by any putative class member" because "[a]ll of the BLMIS investors suffered the same indirect injury resulting from the theft of the customer property and the demise of BLMIS and could assert the same claim").

After the Bankruptcy Court ruled that the Fox Plaintiffs' TAC sought to assert duplicative claims and dismissed their complaint for declaratory judgment, the plaintiffs appealed to the District Court. On March 20, 2019, the District Court (Broderick, *J.*) entered a judgment affirming the decision of the Bankruptcy Court. The Fox Plaintiffs timely appealed.

## II. Discussion

"In an appeal from a district court's review of a bankruptcy court decision, we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law de novo." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted).[9]

---

[9] There appears to be some confusion over which standard of review to apply in these types of appeals:

> There is an apparent tension in our case law regarding the standard of review for the bankruptcy court's determination that the claim at issue in the complaint is derivative of the Trustee's claims. In [*Fox I*], a case

In deciding whether the Fox Plaintiffs' TAC asserts a § 20(a) control person claim that is derivative or duplicative of the claims that the Trustee asserted (or could have asserted) against the Picower Parties, and is thus enjoined, we must determine if their claim "arise[s] from harm done to the estate and . . . seek[s] relief against third parties that pushed the debtor into bankruptcy." *In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir. 2017) (internal quotation marks omitted). If a creditor's claim "is a general one, with no particularized injury arising from it, and if that

---

involving the same exact injunction at issue here and a similar procedural posture, we noted that "[t]he standard of review for the grant of a permanent injunction, including an anti-suit injunction, is abuse of discretion." 740 F.3d 81, 87 (2d Cir. 2014) (quoting *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 651 (2d Cir. 2004)) (alteration in original). More recently, in *In re Tronox Inc.*, we articulated the distinction that, although the lower court's interpretation of the scope of the injunction was "entitled to deference[,]" the purely legal question of whether the claims at issue were derivative of the trustee's claims was subject to *de novo* review. 855 F.3d 84, 99 & n.20 (2d Cir. 2017). We need not resolve this apparent tension, however, because we would affirm the bankruptcy court under the more demanding *de novo* review.

*Goldman III*, 739 F. App'x at 683 n.1. Here, however, there is no confusion over which standard to employ. It is well settled that a court abuses its discretion when it makes an error of law in deciding how to exercise that discretion. *See In re Aquatic Development Group, Inc.*, 352 F.3d 671, 678 (2d Cir. 2003). A bankruptcy court's determination of whether a claim is derivative is a question of law reviewed de novo. *See Tronox*, 855 F.3d at 99; *see also id.* at n.20. In this case, neither party questions the scope of the injunction, and therefore we review the Bankruptcy Court's decision de novo. *Id.*; *Ball*, 451 F.3d at 69.

14

claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *Id.* (internal quotation marks omitted); *accord* 598 B.R. at 111 (decision below*); Goldman III*, 739 F. App'x at 684. By contrast, a non-derivative claim arises from injury that is particularized to the creditor. *Id.*

We have said that "[i]n distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy." *In re Tronox Inc.*, 855 F.3d at 100. To determine whether a plaintiff's claim is derivative, we will "inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted." *Id*. (internal quotation marks omitted). Here, our job is thus to peek behind the label of the Fox Plaintiffs' § 20(a) control person claim to determine whether the Fox Plaintiffs have alleged a particularized injury—one that is separate from and not covered by the claims already brought (or those that could have been brought) by the Trustee.[10]

Section 20(a) is a creature of securities law. *See Janus Capital Grp., Inc. v.*

---

[10] As we explained in *Goldman III*, a fraudulent conveyance claim is "a claim commonly arising in bankruptcy proceedings" and "is 'usually brought by the trustee, for the benefit of all creditors.'" 739 F. App'x at 684 (quoting *Fox I*, 740 F.3d at 91).

*First Derivative Traders*, 564 U.S. 135, 146 (2011) (explaining that Congress established liability in § 20(a) for violations of the securities laws); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253 n.2 (2010) ("Liability under § 20(a) is obviously derivative of liability under some other provision of the [Securities] Exchange Act [of 1934]."). The relevant portion of the statute provides:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"

*S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2); *see also* 17 C.F.R. § 230.405 (defining control the same way).

The Fox Plaintiffs contend that evidence contained in Madoff's Deposition and Declaration establish Picower's control and support a bona fide control person claim.[11] We disagree.

Instead, we agree with the Bankruptcy Court that Madoff's Deposition and Declaration do not provide any evidence that Picower directed the actions of Madoff and BLMIS in the facilitation of the Ponzi scheme. The Fox Plaintiffs point to certain self-serving statements made by Madoff during the Deposition, but those statements are conclusory and non-specific. For example, Madoff's assertion that "Picower . . . created the fraud I perpetrated" provides no facts whatsoever about what Picower allegedly did to "create[]" the scheme. App'x 1484. To the contrary, Madoff's deposition details how the scheme evolved, and the thrust of his explanation is that he resorted to fraud because Picower and other

---

[11] As previously discussed, *Goldman III* considered the loan and counterparty allegations that the Fox Plaintiffs advanced before the district court here and concluded that they did not "demonstrate that Picower controlled BLMIS within the meaning of § 20(a)." 739 F. App'x at 685; *see also id.* at 686 ("[The loan and counterparty] allegations demonstrate only Picower's understanding that his participation would result in the dissemination of false information, not that he actually directed that the dissemination of false information occur or otherwise had control of the primary violator of the securities laws." (internal quotation marks omitted)). We see no reason to conclude otherwise in this case.

17

investors demanded high returns that Madoff could not supply, and that the pressure of those demands led him to pretend that he had indeed achieved such returns. At no point does Madoff ascribe to Picower so much as a suggestion that he should falsify the results of his investment decisions, still less does he describe any plan that Picower "created" to execute any such scheme.

The allegations contained in the TAC, augmented by these new sources, at best establish that Picower and Madoff were close, both personally and as business associates, that Picower put pressure on Madoff to deliver large returns, and that Picower was aware of and at times profited from the fraud. That is a far cry from demonstrating that Picower exercised "control" over Madoff and BLMIS to perpetuate the infamous fraud. *See* 17 C.F.R. § 230.405; *First Jersey Sec., Inc.*, 101 F.3d at 1472–73. In fact, in the Madoff Deposition, Madoff takes sole responsibility for creating the Ponzi scheme. *See* App'x 97–98 (Madoff explaining the decisions that precipitated his debt of billions of dollars); *id.* at 99–101 (Madoff explaining how he started and orchestrated the Ponzi scheme); *id.* at 111 (Madoff taking responsibility for the Ponzi scheme). Ultimately, the Fox Plaintiffs' allegations of "control" do not rise to the level of a colorable control person claim pursuant to § 20(a).

18

The fact remains that the TAC fails to adequately allege particularized injuries suffered by the Fox Plaintiffs that were distinct from the harm suffered by the BLMIS estate in general. Under our basic bankruptcy analysis, the alleged harm here was the same across all creditors, and therefore the Fox Plaintiffs have not alleged a particularized injury.[12] *See In re Tronox Inc.*, 855 F.3d at 100. As a matter of law, the Bankruptcy Court did not err in concluding that "[a]ll of the BLMIS investors suffered the same indirect injury resulting from the theft of the customer property and the demise of BLMIS and could assert the same claim." 568 B.R. 203, 217 (Bankr. S.D.N.Y. 2017), *aff'd*, 598 B.R. 102 (S.D.N.Y. 2019); *see also Ball*, 451 F.3d at 69. Because the Fox Plaintiffs lack "a claim for injury that is particularized as to them," *In re Tronox Inc.*, 855 F.3d at 99 (internal quotation marks omitted), the claim they seek to assert "could be brought by any creditor of the debtor" and therefore "the trustee is the proper person to assert the claim," *id.*

---

[12] What is more, the Fox Plaintiffs, in their TAC, assert class action allegations that undermine their particularized injury argument. *See* App'x 64 ("'Class' in this action is all Customers who entrusted securities or cash to Madoff, either directly or indirectly, pursuant to the Madoff Investment Program between December 1, 1992, the approximate date that Picower first became a control person of Madoff, and December 11, 2008, the date that Madoff confessed."); *id.* at 65 ("Among the questions of law and fact common to the Class are: (i) whether section 20(a) of the Exchange Act ('Section 20(a)') was violated by Picower as alleged herein . . . ."); *id.* ("[A]ll members of the Class were similarly affected by Picower's wrongful conduct in violation of federal and state law as alleged herein.").

at 100 (internal quotation marks omitted). Accordingly, the Fox Plaintiffs are barred by the permanent injunction from bringing their claim. *See* App'x at 499 (enjoining "any claim against the Picower [Parties] that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the Picower [Parties]").

We have considered the Fox Plaintiffs' remaining arguments and conclude that they are without merit. For the foregoing reasons, the judgment of the District Court is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

20